17-22-10 Joshua Brennan v. James Dawson Attitude, et al. Oral argument, 15 minutes per side Supervisory, attorney, Department of Recreation, Police Department By law student, Mr. Noah T. Good morning and may it please the court, I'm Tillman Breckenridge from the William & Mary Law School. Just here to introduce Noah Chauvin, a third year law student who will argue on behalf of Joshua Brennan. Thank you. Thank you. May it please the court, I'm Noah Chauvin on behalf of Joshua Brennan. May I please request two minutes for rebuttal? Yes. When Deputy Dawson first stepped onto Mr. Brennan's property, he had a right to be there, despite the fact that he didn't have a warrant and there were no exigent circumstances justifying his presence. He had a right to go to Mr. Brennan's front door, to knock on it, to wait to be received, and if he wasn't received, he had to leave. Unfortunately, he didn't do that. Instead, he lingered for an hour and a half. He circled the house five to ten times, pounding on doors and windows. He took Mr. Brennan's security camera, which was pointed at the front entrance, and he turned it away from the entrance so that Mr. Brennan could no longer see outside, and he further obscured it with crime scene tape from his police vehicle. He also turned on the emergency lights and sirens on his police vehicle in the driveway. He did all this in violation of Mr. Brennan's clearly established Fourth Amendment protections and his curvilage. As the Supreme Court said in Florida v. Jardines, police officers have an implied license to come onto property to try and make contact with people inside the house. It's the knock and talk exception, and that license extends as far as a stranger would have when coming up to the house. Just as Scalia colorfully put it, it's the same license that Girl Scouts and trick-or-treaters navigate without issue every year. Is Hardesty still good law? Your Honor, we believe that to the extent Hardesty allows the police officers to extend the knock and talk exception to go around to the back of the house, it's been abrogated by Jardines. But is that beyond debate? I mean, would a reasonable official know that? Because our court just applied it in 2016. We believe a reasonable official would know that. We also don't think you necessarily need to reach that issue in this case. But it says you can take reasonable steps to find the person, right? That's right. And so do you have any case law showing this is unreasonable, this scenario is unreasonable? Well, Your Honor, I think Jardines speaks to that. And even Hardesty itself, I think, would speak to that issue as well. In Hardesty, the officers approached the house. They saw the lights go off as they approached it, and so they had good reason to believe that there were people in the house, so they went around to the back door to try and get in. That also says we don't want to see officers go away. Exactly. So I guess what I'm struggling with is if Hardesty remains good law, then why wouldn't Hardesty apply here? And the question would be were these reasonable steps? And then the next question would be, in light of Wesby, is it beyond debate to a reasonable official, to an official, that this is unreasonable? And let me ask the third question just so that you have it all. And then what case would show them that? So let me try and take these in order. If you want me to ask one again, I will. Yeah, I'm sorry. Could you go back to the first one? Yeah. I apologize. So let's assume Hardesty remains good law. Okay. So then the question is, is this a reasonable step? And we would say no, it wasn't. Because the actions went so far beyond what was acceptable in Hardesty. This isn't just going around to the back door and then not getting a response and leaving. This is staying for an hour and a half beyond first stepping onto the property. So could the officer have stayed in the police car on the street and waited for some action to occur, such as Mr. Brennan coming out of the house an hour and a half later? Your Honor, I think that still would have been a violation of Mr. Brennan's rights. Really? Just a street? An officer can remain. I mean, that's a public thoroughfare. And I think it would be a much closer case. And I'm saying that only based on Hardina's word. Justice Scalia said that it's what a Girl Scout or a trick-or-treater would do. And the Girl Scouts or trick-or-treaters aren't. They could set up a stand out there and wait, right? Right. And I think that would be a much closer case. I think here particularly because the officer remained on the property for the full hour and a half. Did he or did he? I thought he went back to his car. I thought he went around it five times, went back to his car. And then when the woman showed up, I can't remember her name, I'm sorry, got out and talked to her and then reengaged. My understanding is that his car was parked in the driveway. So he was on the property. Even when he was in the car, he was on the property the entire time. Do we know whether the car in the driveway was within the curtilage or not? Because depending on the length of the driveway, it might vary. That's right. Based on the dash camera video, which I believe was submitted as part of the record, you can see that the car looks like it's at most 20 to 30 feet from the house. The curtilage is typically 5 to 7 feet, right? I'm not certain, Your Honor. That's fine. So is Nihilus maybe your best case? I think it definitely is. Not for the proposition that the law was clearly established at the time this violation occurred. But the steps, we affirmed the district court in saying that the steps were not reasonable. Is that right? That's correct, yes. And they stayed on the property for an hour or more, whatever it was. I believe it was also roughly about an hour and a half. But that case, you have a timing problem, right? I mean, that case came out after the actions and this happened here, right? We do, and we're not using that case to try and establish, to try and say that the law was clearly established at the time this violation occurred. But that case does go to show that the protections in the curtilage are clearly established. And so while that case did come out after this conduct. But don't we need a case, don't we need something going to durational limits? What is reasonable? If I know somebody is inside, I suspect somebody is inside the house, right? So that's a slight change in the normal fact pattern where I just walk up to a house, knock, nobody answers, I have to leave, right? If I know somebody's in, I have reason to suspect somebody's in there because I hear noises, I get to do more stuff, right? I mean, isn't Hardesty says I can try to find the person, right? I can go knock on the window. So don't we need a limit on that principle, a case that says you can do that, but you can't do it five times or you can't do it for an hour or whatever it is? That's correct, Your Honor. And I think that case is Hardenas, which says that the license you have extends as far as a stranger would have coming onto the property and trying to make contact because, again, if a stranger comes onto your property and knocks on the door, they may hear you inside. Could a stranger go around the house looking for you? I think it would depend on what was customary in that location, and that would be more of a factual question. But I think a stranger could not stick around for an hour and a half. On the property. But really you want us to look at the Hardenas case. I'm sorry if I'm mispronouncing it. And, you know, that has language that says that the license of the officer typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then absent invitation to linger longer, leave. And so your point would be here there was no invitation by Brennan to the officer to stay, to linger longer. And Jardines is decided in 2013. And the search, the events here occurred in 2015, am I right? I believe it was February 21, 2015. Okay, so Jardines is the law. So to the extent that Hardesty, which was decided earlier, conflicts with Jardines, Hardesty is no longer valid. That's correct, Your Honor. But was applied by our court in 2016. So it's a little unfair to ask an officer to make that conclusion when we even haven't made it. Correct? I mean, you're asking an officer to look at two cases and resolve, and that's what WESB stands for is we can't do that. That may be correct, Your Honor, but I think the behavior here extended so far beyond what Hardesty said was reasonable. Did Hardesty say, that's a great point, did Hardesty say what is reasonable? Because that was Judge Nalbandian's question is, what case would tell the officers this durational limit is unreasonable? And that's a fair point. I don't think Hardesty actually drew that line. What Hardesty said is that you can take reasonable steps to try and make contact with people in the house. But I think— And why isn't it like a Kentucky versus King where if I'm investigating something, I suspect somebody's in the house, so that changes the fact pattern because I'm knocking on the door, but the lights go out or I hear a noise, and then am I— and this defendant is, he's on probation, he's subject to this warrantless breath test whenever. Why does that not make it, you know, I'm afraid there's going to be evidence that gets destroyed or he's in there, I don't know what he's doing. I mean, does that change the scenario with having those facts? No, it doesn't, Your Honor, for a few reasons. First of all, I should point out there's a factual issue with the deputy knowing that someone's in the house. He said in his deposition that he couldn't say if it was a person or a dog, the noises he heard when he was first standing at the front door. I think beyond that, getting to the evidence being destroyed, there's no exigent circumstances in this case because the only evidence that could be destroyed would be the alcohol in the bloodstream. And the Supreme Court said in Missouri v. McNeely that the dissipation of alcohol in the bloodstream alone isn't enough to establish an exigent circumstance. We also have pretty good evidence here that Deputy Dawson didn't believe there was an exigent circumstance because if there was, it would have warranted him not only violating the curtilage, but also violating the Fourth Amendment protections in the home. And he lingered for an hour and a half without doing that. And so he couldn't have believed that there was an exigent circumstance that kind of warranted that Fourth Amendment violation. But I think even beyond that, although Mr. Brennan agreed to the warrantless breath test, that was the only Fourth Amendment protection that he waived. He didn't explicitly waive any other protections. And so the deputy's license to be on the property only extended as far as a stranger would have. It didn't extend any further than that based on the probation agreement in this case. Only apart from the curtilage issue that we've been talking about. Should there be qualified immunity for the arrest? And the arrest is based on the failure to submit to the PBT in a timely way, right? So do you have a claim that can go forward vis-a-vis the arrest, even if we, assuming we put the curtilage issue to the side? That's correct, Your Honor, we do. The obligation to submit to the breath test only triggers at the point where the test is actually demanded. And in this case, the deputy didn't demand a test until Mr. Brennan actually came out of his house. At that point, as soon as he demanded the test, Mr. Brennan submitted to it. Again, we get back to this beyond debate. The officer could believe that when he rang and knocked and beat on the house, he was demanding the test be submitted to. And that would be enough to arrest him, right? If he knew and didn't come out and didn't take the breath test on demand, that would be enough. Your Honor, may I answer that question? Yes. If Mr. Brennan knew that the officer was there to demand a test, then yes, he would be under an obligation to come out. So could a reasonable official make the conclusion that since I've trounced around this house, activated my siren, beat on the door, waited for him, talked to a woman who had multiple stories that he knew? I don't think they could because I think the reasonable official would have tried to make an effective demand, and the officer didn't do that. He stayed outside, pounding on the doors and windows, turning on the sirens, but he never yelled out, hey, I'm here to do a breath test. What else is he to do? Yell out and say I want a breath test. Right. Yell that out. He has to do that or he's liable. Even though he beat on the house, rang the doorbell, activated his sirens, asked this woman who gave him multiple stories, which looks suspicious to begin with. I think there are other steps he could have taken as well. He could have, for example, tried to call Mr. Brennan. What you're saying is he has to do that. Yes, he has to take those steps to make the demand. Okay. Thank you. Good morning. May it please the Court. Marcy Stepanski on behalf of the defendants at Belize in this case. Just to pick up on Your Honor's last question to Brother Counsel, this was not, it's in the record, it's in the briefing, this was not the plaintiff's first rodeo. He has been arrested in the past. He's been on probation in the past. He agreed to this term to avoid incarceration, the term of a PBT on demand. And he certainly, looking at this from an officer's perspective on the scene, which is what we're required to do when we're evaluating probable cause, certainly an officer could believe that plaintiff was attempting to avoid taking the PBT. That in conjunction with his avoidance the night before when officers were on the scene for 30 minutes and he refused to come out despite the fact that Josh Dishnell exited the trailer and said, he's inside and he's awake. So then the officers go back the next night, again, refuses to come out. Then we have Ashley. But the officer could have said very loudly, I'm here to give you your PBT. He could have, but there's no case indicating that that's required, Your Honor. And in addition to that, then we might have another argument from the plaintiff that, you know, doing that may have violated his privacy rights, screaming it out for the neighbors to hear. I mean, I think that it was pretty obvious this is something that he had agreed to, and it was clear that he was actively avoiding taking the PBT. Ashley Wright, when she appeared on the scene, she said one of her first stories was that he had called and indicated he was on vacation and wanted her to go and find out why someone was at his house. Then her story changed a few times. So my brother called me and asked me to do this. Then my father called and asked me to do this. And that wasted about 20 to 30 minutes, by the way, of Deputy Dawson's presence on the scene. Why didn't he just go get a warrant? I mean, certainly he could have gone and gotten a warrant, but there are a couple things. First of all, when are we required to do that? Because there's no guidance that suggests that any time that you appear and you attempt to make contact with a probationer and they don't answer the door, that you should then immediately go get a warrant. I mean, there's got to be some sort of indication for our officers to be able to determine when exactly they need to do that. There had been the previous event the day before, which would suggest that Brennan was not going to easily comply with a PBT. And so that would seem to be a trigger for the officer to go get a warrant at that point. Well, it could have been, but then it also could provide the plaintiff with an argument that, you know, I was in the house but I didn't hear the knocking. Maybe Josh did when he went out and saw the officers. I mean, the point of this officer taking these actions was to prevent the plaintiff from having an argument later saying, I didn't know that he was there. I didn't hear him. I was sleeping. This is exactly the argument that they made in their brief, in fact, when we moved from the search argument to the arrest argument, where they argue, well, as soon as he demanded, I complied. I mean, it's a very disingenuous argument. This officer made a number of attempts to get him to comply with this order that he agreed with and to say that he was required to immediately get a warrant when he didn't answer the door. What about the search condition? Can I move you to that? Because as Judge Moore said to your friend on the other side, it's pretty clear that Hardinaz says you can't linger. And he clearly lingered. So why is he entitled to qualified immunity? Jardines is distinct for two significant reasons. First of all, in that case, the officers were conducting what was deemed a forensic search of the curtilage with a trained search dog. But they were not searching for the plaintiff. Well, they were searching for criminal activity, evidence of criminal activity in the curtilage. I mean, that's really what Jardines is about, searching for criminal activity in the curtilage itself. No, no, Jardines, wasn't that the one with the dogs? That is. To see if there was marijuana inside the house? Well, they were using the dog.  To detect odors from inside the house. Search of the house. And what he's doing here is he's searching the house for the defendant. Well, Hardinaz, this case is more similar to Hardinaz, where Hardinaz says, where officers were not searching the curtilage for criminal activity like they were in Jardines, but were attempting to make contact with the occupant for valid reasons, it's a distinct situation. And here we have the added situation with the probation order. We didn't have that in Hardinaz. We didn't have that in Jardines. It doesn't change anything because you don't have the search condition. The only thing the probation order allowed you to do is give the test on demand. It didn't allow you to invade his otherwise protected privacy. But in conjunction with the probation order, I mean, I think it has to be implied that the officer needs to make every opportunity to let the probationer know that he's demanding the test. Otherwise, there will always be this argument that... So it seems to me that's hard to square with your other argument, because it seems to me he did that when he banged on the door. Let's say I buy that argument and I say, okay, they lose on the arrest condition. Then everything he did thereafter seems to me well beyond the implied license to stay. Well, I think it's completely different from what the Supreme Court was envisioning when they decided Jardinez, because like Justice Scalia had said, you know, this is similar to what a trick-or-treater or a Girl Scout would do. Well, in our case, the officer is armed with an order requiring the plaintiff to submit on demand to a PBT. Trick-or-treaters and Girl Scouts are not armed with those types of things. That didn't give you, I mean, your officer concedes, I think, that didn't give you authority to break down the door and go in. No, certainly not. So if we conclude circling the house multiple times is a search, right, then if he exceeded his license, then he's violating the rights. But there's no case law to demonstrate that he was, this was clearly established that he could not make every effort to contact the plaintiff to... Jardinez says you can't linger. But Jardinez didn't have, okay, saying that Jardinez governs all situations hereafter from curtilage entries is like saying that Graham v. Conner governs all excessive force cases. There are always nuances and always particularized facts that the courts have to consider when these situations arise. Just like this officer... What are the relevant facts? I guess I'm asking what Judge Lepar is asking, but the probation, you have search conditions and you have these PBTs, but they're not the same. So why is it that the breath test allows you to do all kinds of things on the curtilage or with regard to the property? Well, there's, when a probationer agrees to take a breath test on demand, that implicitly suggests that an officer has the duty to make every effort to let the probationer know that the test is being demanded. Could the officer break down the door? No. Could he throw a rock through the window? No. So why can he otherwise violate your rights, why shouldn't we consider it against him that you don't have the search condition? I mean, it seems to me that if the court wanted you to be able to do this, they would impose the search condition. Well, the search condition certainly would have allowed him to enter the home, but in this case, he did what was in that gray area in terms of hardesty, what that allows, what was not contemplated in Jardines. Even Justice Alito's dissent in Jardines says this, a visitor cannot traipse through the garden, meander into the backyard, and take other circuitous detours that veer from the pathway that a visitor would customarily use. Right, and what sets this case apart is that if the plaintiff is required to submit to the PBT, the officer has to let him know that it's being demanded. Otherwise, there would never be any incentive for any probationer to comply. You concede, right, he can't otherwise violate his rights to demand the breath test. No, but he needed to, with everything that this officer had before him in terms of what occurred the night before, Ashley Wright's presence on the scene, and the fact that PBTs are... Let's say that, hardesty said, the only steps you can take are go to the door, knock, wait a couple minutes, and leave. Would you lose? No, because hardesty didn't deal with an order of probation. So that sets this case apart. So his status as a probationer changes his rights. Well, I'm not saying that necessarily his status as a probationer, but the requirement for him to submit to a PBT on demand requires the officer to let him know that the PBT is being demanded. If he had just knocked a couple times and left, plaintiff would have said, I didn't hear him and I didn't know it was being demanded. Could an officer pull him over on the road without any other thing to demand the breath test? Temporary seizure, could you pull him over? Arguably, I think that he might be able to do that. I mean, it's PBT on demand. I mean, the officer wouldn't probably know that he wasn't allowed to do that, given the state of the law. There needs to be some additional guidance. If the court is going to consider reversing Judge Stee, in this case, there needs to be some additional guidance with respect to how to handle these probationers, because the officer is really stuck between a rock and a hard place. He made his best efforts to try to contact the plaintiff. I'm sure I understand that. So they knew the night before that he wasn't responding. A, they could have gotten a warrant. B, they could have gotten not only a warrant, but the court to sign off on a changed condition. And Michigan has, this was Michigan, right? Michigan has, we know that for all circuit court defendants, they have the search condition. I assume for district court defendants, you can also put in the search condition, but it's not mandatory. And that's not the deputy's prerogative. I understand, but he can go to the court and ask, right? So you know the night before, why is the only action he can take to arguably invade this person's rights? Well, he attempted to go back again and give him another chance. I mean, to immediately get a, I mean, that's a good question, Your Honor. Is that what we're required to do, to immediately then get, if someone doesn't answer one time when we go and knock, then are we required to go get a search warrant, or can we attempt a second time? I mean, the area with respect to... The question is not whether, you can attempt ten times, but the question is, can you linger, can you go around the property, can you bang on the house for five to ten times? And we would say in this situation, where it appeared that he was attempting to avoid it, that was the best course of action, because then it cut off his argument to later say, I didn't know that you were demanding it, which is exactly the argument that they made with respect to the arrest. That's why the officers between a rack and a hard place, because if they just knock and leave, then it leaves the plaintiff with the argument that, I didn't hear you, I didn't know you were there, I didn't know you were demanding it. If he stays and he makes every effort to alert the plaintiff that he's there and demanding the test, the sirens, the lights, the knocking, then it's too much. So we need some guidance in terms of... What about giving the guidance that under the circumstances of the, after the first effort to reach Brennan failed, the officer needs to go get a warrant in order to go through the curtilage and go into the house and order a breath test? That is guidance, Your Honor, but it's not something that this deputy had the benefit of. So you're going to go off on the clearly established, but that guidance would comply with Hardina's? I think it would, but it would also create quite a burden on the courts, but at least that is something that is a clear line that our officers can work with. Other than that, it's very difficult to determine what exactly they're allowed to do and not allowed to do. So it's too much of a burden? Not on our officers. I mean, it may be a burden on the judicial system because a lot of these things happen at night when people are more apt to be consuming alcohol. Do you think what he did here was reasonable? I think that under these circumstances it absolutely was, Your Honor, because it was designed to preclude the plaintiff from being able to say, I didn't know that you were trying to get a hold of me. I didn't know that you were attempting to administer a PBT, which again is exactly what he argues. If we were to uphold that argument of yours, we would be saying, in effect, that Hardina's allows for an exception to the protection of the curtilage when you have a probationer who has once appeared to fail to produce himself for a requested PBT. What I'm saying is that with respect to qualified immunity, the court always looks at the particularized facts of the case confronting the officer and that Jardinus did not clearly establish the law with respect to what the officer was permitted or not permitted to do in this case because the facts were so different from Jardinus where he wasn't searching for criminal activity in the curtilage. He was, like Hardesty, attempting valid contact with the- He was searching for criminal activity inside the house. He was attempting to make contact with a person not looking for drug activity with a drug detection dog. So that in conjunction with having the probation order. So there are so many different factual nuances to this case. He wasn't even searching for criminal activity, was he? I'm sorry, Your Honor? I mean, at least in Hardinus, they had a tip that there were drugs in the house, right? He was just trying to enforce an order in our case. He was just trying to make contact with the probationer and enforce the order. And he was on the phone with the probation officer during the time that he was on the premises. I see that my time is up. Unless the Court has any other questions?  Thank you. I have just a few points I'd like to make. First of all, Judge Nopandian and Judge Thapar, you followed up on this. The Court doesn't need to have an exact case, talking about the duration of time that the officer can spend on the curtilage. The Supreme Court this last term made very clear in Collins v. Virginia how well-established the protections in the curtilage are. Your client did give up some rights, right, with this probation condition? He gave up. He's subject to what would otherwise be a search, right? The breath test? That's correct, yes. Okay, so he's agreed to be subject to that search without a warrant on demand. Yes, that's correct. Okay. What are the limits, then, on what the police can do if they want to administer this test? Well, they have to make an effective demand of some kind. Like I mentioned earlier, that could be just after knocking, yelling out loudly what they're there to do. It's kind of ironic, right? You're complaining that he did all these things to try and get his attention. But you're saying that it's not enough in the second claim to make him aware. I mean, I find that kind of ironic. You're saying officers have to do all these things to make him aware, but when they do them, they essentially violate his rights. No, Your Honor. I'd classify it slightly differently. I think the steps that he took weren't effective steps to convey that he was there to do the breath test. There's a factual dispute about whether or not Mr. Brennan even knew the officers were outside to begin with and taking the facts in the light most favorable to Mr. Brennan. He didn't know that officers were there to begin with. But even if he had, the officers have to take steps to indicate that they're there to perform this breath test. Then how is he damaged by everything they did? I'm just curious. I know that's not part of this inquiry. But if they never knew and nothing happened, it's kind of like a tree falling in the forest when no one's there. How is he harmed? Well, he's harmed, first of all, there was some damage to his property. And he still didn't know? I'm sorry? And he still didn't know? What was the damage to his property? I believe his security camera was damaged, and that's in the interview he did with the police internal affairs team. There's also the embarrassment of having the police there for an hour and a half with the lights and sirens on. As Deputy Dawson said, he's pretty sure he woke up half the neighborhood. And beyond that, and this gets me. Not Brennan. I'm sorry? But not Brennan. Evidently not. Brennan said that he had, that he was, is he the one who says that he had a cold or something and he was sleeping? Was that his explanation? That's correct, yes. He apparently was asleep, and when the sirens went on, he woke him up and he got dressed and went outside. And he was sleeping the night before, too, with the same cold medicine? That's not clear to me. This may sound like it's off topic, but if Brennan were walking down the street and the police officer, the same police officer, knew about the night before, could the police officer just simply say to Brennan, hi, I know you're Brennan, and you're supposed to submit to a PBT on demand, and here I am, and I want to give you a PBT. Could that happen? Absolutely do that. That would be an effective demand, and the probation agreement would require Brennan to submit to the test. Could they pull him over to do it? No, they couldn't, because there they'd have no probable cause to do that. And so they're required to make that effective demand without violating his other rights, and that's just not what happened in this case. Going to the arrest, there's no evidence that Mr. Brennan knew that the officer was there, let alone that he knew that he was there to demand that. The officer doesn't have to know that, right? The officer only has to believe that he knew and didn't submit. For an arrest, it's what the officer knew, not what Mr. Brennan knew. Yes, but a reasonable officer in this case couldn't have thought that. First of all, because Mr. Brennan blew the 0.000 on the alcohol breath test. The result's irrelevant. If he's evading, then he's evaded the demand, and the officer has permission to arrest him. And the officer, to be fair, believed he woke up half the neighborhood, to use your words. So it seems pretty reasonable that a reasonable official would believe that Mr. Brennan knew he was there. And he had this absolutely right making multiple stories. That's correct, Your Honor. And a reasonable officer could have believed that he knew he was there, but a reasonable officer couldn't have believed that he knew he was there to perform the breath test. Why else would they be there? Is there any other condition in probation that he would be there for? There's not, but the police could be there for any number of reasons outside of trying to perform this breath test. And Deputy Dawson never indicated before Mr. Brennan came outside and actually spoke with him that that's what he was there to do. Thank you. I see your red light is on. We've taken you beyond it. We thank you very much for your argument, and we're especially impressed that, as a law student, you've been handling our questions as beautifully as you have, and we appreciate the argument on the other side as well. So we thank you both, and the case will be submitted. And the clerk may recess court.